**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| A.G.P.C. and E.L.O., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 10729 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| SAMUEL OLSON, Director of the Chicago | ) | |
| Field Office, U.S. Immigration and Customs | ) | |
| Enforcement; MARKWAYNE MULLIN, | ) | |
| Secretary of the U.S. Department of Homeland | ) | |
| Security; TODD BLANCHE, Attorney General | ) | |
| of the United States; ROBERT F. KENNEDY, | ) | |
| JR., Secretary of the U.S. Department of | ) | |
| Health and Human Services; ANGIE | ) | |
| SALAZAR, Acting Director of the HHS Office | ) | |
| of Refugee Resettlement; ALEX J. ADAMS, | ) | |
| Assistant Secretary of the HHS Administration | ) | |
| for Children and Families; SANDRA | ) | |
| CEASAR, ORR Federal Field Specialist | ) | |
| Supervisor; in their official capacities, | ) | |
| | ) | |
| Defendants.[1] | ) | |

**OPINION AND ORDER**

Plaintiffs A.G.P.C. and E.L.O. are two unaccompanied alien children ("UACs") from

Honduras who are currently in the custody of the Office of Refugee Resettlement ("ORR") and

living with foster families in the Chicago suburbs.  After Plaintiffs' lawyers received notice that

U.S. Immigration and Customs Enforcement ("ICE") had taken steps to gain custody of

Honduran UACs with the intent to repatriate them to their home country, Plaintiffs filed this

---

[1] Plaintiffs filed their complaint in September 2025 and named individuals as Defendants in their official capacities who no longer hold office.  As appropriate, the Court substitutes the individuals currently holding these offices as named Defendants.  *See* Fed. R. Civ. P. 25(d).  Specifically, the following are Defendants in this suit: Samuel Olson, Director of the Chicago Field Office, U.S. Immigration and Customs Enforcement; Markwayne Mullin, Secretary of the U.S. Department of Homeland Security; Todd Blanche, Acting Attorney General of the United States; and Alex J. Adams, Assistant Secretary of the HHS Administration for Children and Families.

lawsuit against various Executive Branch officials in their official capacities alleging that repatriation violates the Trafficking Victim's Protection Reauthorization Act of 2008 ("TVPRA"), the Immigration and Nationality Act ("INA"), and federal regulations.  Defendants now move to dismiss for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Because the Court finds that it has jurisdiction over Plaintiffs' claims, it denies Defendants' motion to dismiss.

## BACKGROUND

Plaintiffs are natives and citizens of Honduras.  Between 2022 and 2023, Plaintiffs separately entered the United States as minor children without an accompanying parent. Plaintiffs encountered U.S. immigration officials who designated them as UACs and transferred them to the custody of ORR.  Plaintiffs both remain in the care and custody of ORR and currently reside with foster families approved by the Department of Health & Human Services ("HHS").  A.G.P.C. lives in Naperville, Illinois and E.L.O. lives in Gurnee, Illinois.

ORR and ICE custody vastly differ.  In ORR custody, children may attend school in the local community, engage in extracurricular activities, seek medical and dental services, and meet with case managers to determine and service any additional needs.  Child-protective services, such as the Illinois Department of Children & Family Services ("DCFS"), approve and license ORR facilities.  In contrast, ICE does not design its facilities for children and no child-protective services organizations approve or license ICE's detention centers.  In ICE custody, detainees reside in an ICE detention center without access to the community, schools, or other services.

On January 4, 2023, the Department of Homeland Security ("DHS") initiated removal proceedings against E.L.O.  On December 23, 2023, E.L.O. applied for asylum by submitting a Form I-589 application for asylum and withholding of removal with the United States

Citizenship and Immigration Services ("USCIS").[2]  E.L.O. then sought to terminate his removal proceedings because USCIS has initial jurisdiction to adjudicate E.L.O.'s asylum claim in the first instance.  The Chicago Immigration Court granted E.L.O.'s removal termination request on December 4, 2024.

On December 10, 2024, DHS initiated removal proceedings against A.G.P.C. and scheduled a hearing for October 1, 2025 before the Immigration Court in Chicago on the Juvenile Docket.  A.G.P.C. is the subject of a guardianship proceeding in DuPage County in which she is seeking the predicate legal findings necessary to apply for Special Immigrant Juvenile Status ("SIJ status") with USCIS.  SIJ status is a form of immigration relief available to children whose parents abused, neglected, or abandoned them and for whom it is in their best interest not to return to their country of nationality.  Minors with SIJ status are eligible to apply for adjustment of status to legal permanent resident when a visa becomes available.

In the middle of the night on August 30, 2025, ICE, in coordination with the Guatemalan consulate, took action to remove Guatemalan UACs from the care and custody of ORR to place them in ICE's custody and remove them from the United States.  On that same night, a different court in this district entered a temporary restraining order ("TRO") preventing the removal of Guatemalan UACs in ORR custody.  The next day, that court held an emergency hearing and issued a preliminary injunction preventing the removal of Guatemalan children at the Naperville and Gurnee ORR detention centers.  Separately, a district court in Washington, D.C. issued a

---

[2] In the complaint, Plaintiffs allege that E.L.O. applied for asylum on December 23, 2024 and that the Chicago Immigration Court granted E.L.O.'s removal termination request, premised on his pending asylum application, on December 4, 2024.  But the Court assumes that one of these dates contains a typo because the Chicago Immigration Court could not grant E.L.O.'s removal termination request before E.L.O. applied for asylum.  The Court believes that Plaintiffs meant to state that E.L.O. applied for asylum on December 23, 2023 (rather than December 23, 2024).  It is also possible, however, that the Chicago Immigration Court granted E.L.O.'s removal termination request on December 24, 2024 (rather than December 4, 2024).

3

nationwide TRO on August 31, 2025 preventing the removal of Guatemalan children in ORR custody without a final removal order. That court then entered a preliminary injunction order on September 16, 2025, enjoining the government from repatriating or otherwise facilitating the transport of all Guatemalan UACs in the government's custody.

On September 4, 2025, Plaintiffs' counsel, as the legal service provider for children at the ORR detention center in Naperville, Illinois, received notice that "ICE may soon be taking into custody minors from the country of Honduras with the intent to repatriate them to their home country." Doc. 1 ¶ 19. On September 5, 2025, Plaintiffs' counsel, as the legal service provider for children at the ORR detention center in Gurnee, Illinois, received the same notice.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174. If, however, the defendant contests the truth of the jurisdictional allegations—a factual challenge—the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established subject matter jurisdiction by a preponderance of the evidence. *See id.* at 173; *Apex*

*Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444–45 (7th Cir. 2009); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

## ANALYSIS

Defendants frame their argument as one concerning standing, but they cite to two cases that reference ripeness in their opening brief. *See* Doc. 23 at 6. After Plaintiffs interpreted Defendants' argument to discuss prudential ripeness and responded accordingly, Defendants clarified in their reply brief that they base their dismissal argument on constitutional—not prudential—ripeness. But Defendants next state that their constitutional ripeness argument reasons "that plaintiffs lack standing because their asserted injury is speculative." Doc. 33 at 4. To this Court, Defendants do not clearly develop any ripeness arguments independent from their standing argument. Perhaps Defendants do not differentiate because "[b]oth [the standing and ripeness] doctrines bar a plaintiff from asserting an injury that 'depend[s] on so many future events that a judicial opinion would be advice about remote contingencies.'" *Rock Energy Co-op. v. Vill. of Rockton*, 614 F.3d 745, 748 (7th Cir. 2010) (quoting *Meridian Sec. Ins. Co.*, 441 F.3d at 538). Accordingly, the Court only analyzes Defendants' argument for dismissal utilizing a standing analysis.

Defendants contend that the Court must dismiss Plaintiffs' lawsuit because Defendants have no plans to repatriate or transfer custody of Honduran UACs—a factual challenge to the truth of Plaintiffs' subject matter jurisdictional allegations. "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). "Standing to sue is an important component of that limitation." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th

5

Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To establish standing to seek injunctive relief, Plaintiffs must allege (1) "an actual or imminent threat of suffering a concrete and particularized 'injury in fact,'" which (2) Plaintiffs can fairly trace to Defendants' conduct and that (3) a favorable judicial decision will likely prevent or redress. *Common Cause Ind. v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019). Plaintiffs "must face a 'real and immediate' threat of future injury as opposed to a threat that is merely 'conjectural or hypothetical.'" *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 95–96.

Defendants dispute whether Plaintiffs have suffered any injury in fact because they characterize Plaintiffs' alleged injury as "entirely speculative." Doc. 23 at 6. Defendants state that they have no plans to repatriate Plaintiffs to Honduras or transfer Plaintiffs to ICE custody. To support their statement, Defendants attach a declaration from ORR Acting Director Angie Salazar. Salazar avers that "ORR has no imminent plans and no definite plans to repatriate Honduran [UACs]" nor any plans "to transfer custody of the named plaintiffs in this matter to ICE." Doc. 23-1 ¶¶ 3–4. Because Defendants have questioned Plaintiffs' jurisdictional allegations as a factual matter, Plaintiffs "must support each controverted element of standing with competent proof, which [the Seventh Circuit has] understood as a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (citations omitted) (internal quotation marks omitted).

6

Plaintiffs respond by detailing the steps Defendants have taken, both before and after Plaintiffs filed this lawsuit, to repatriate children in ORR custody. Plaintiffs explain that Defendants first compiled lists of Guatemalan and Honduran children in ORR custody, cataloging their names, addresses, birth dates, and details about their ORR facilities. The list of Honduran children included Plaintiffs' names and information. Doc. 29 at 3. A whistleblower then leaked these lists to legal service providers who provide legal services to children in ORR custody, including Plaintiffs' counsel. Doc. 29-1 ¶¶ 3–4. Defendants next attempted to remove Guatemalan children in ORR custody from the United States in the middle of the night over Labor Day weekend in 2025, rousing them from their beds, loading them on buses, driving to the airport, and putting some of them on airplanes. Lawyers around the country quickly filed cases to enjoin the children's removal, including a suit in this district. *See L.G.M.L. v. Noem*, No. 25-cv-2942 (D.D.C) (entering nationwide temporary restraining order on August 31, 2025 and nationwide preliminary injunction on September 18, 2025 enjoining defendants from removing Guatemalan UACs); *J.J.T.S. v. Noem*, No. 25-cv-10428 (N.D. Ill.) (entering TRO on August 30, 2025 and preliminary injunction on August 31, 2025 enjoining defendants from removing Guatemalan children); *Kettlewell v. Noem*, No. 25-cv-491 (D. Ariz.) (entering TRO on August 31, 2025 and preliminary injunction on September 25, 2025 enjoining defendants from removing Guatemalan and Honduran children).

And though these suits remain pending, Plaintiffs have submitted evidence of Honduran officials continuing their repatriation preparations. On September 1, 2025, the Honduran Foreign Ministry published an article that quotes Guadalupe Sandoval, Director of the General Directorate for the Protection of Hondurans, describing the "working groups" hosted by his organization to "share experiences and address situations like the one experienced in Guatemala,

7

with deportation of unaccompanied minors from the United States on flights." Doc. 29-3 at 1; Doc. 29-4. And legal service providers continue to receive reports of Honduran consulate officials visiting UACs' Honduran homes and parents. For example, one immigration attorney declares that an ORR case manager contacted him in mid-November to inform him that Honduran attorneys visited the father of one of his UAC clients "on behalf of attorneys in the United States" and told the father that they "were trying to return [his] UAC client and his sister back to Honduras." Doc. 29-5 ¶ 2. Another immigration attorney asserts Honduran officials contacted the families of two of her UAC clients, one in mid-November and one in December. During the December visit, the Honduran officials said they were investigating "whether any of the family members in Honduras can care for [her] UAC client if [her] client is returned to Honduras." Doc. 29-6 ¶¶ 2–3.

Defendants respond with a supplemental declaration from Salazar. In her supplement, Salazar admits that during the summer of 2025, ORR worked with the Department of State ("DOS") and DHS to "explore the *potential* for reunifying Honduran UACs in ORR custody with their parents in Honduras," although she states that the interagency discussions never progressed beyond identifying eligible Honduran UACs. Doc. 33-1 ¶ 6. During these discussions, DOS informed ORR "the President of Honduras was amenable to the repatriation of Honduran UAC[s], and that the government of Honduras had asked for the biographic information of Honduran UACs in ORR custody. *Id.* ¶ 13. ORR then worked with USCIS to produce lists of Honduran UACs in ORR custody with certain background and identifying information and shared these lists with DOS and DHS. *Id.* ¶¶ 10–15. But beyond creating these lists, Salazar states that ORR has not developed "any specific protocols to identify any specific Honduran UAC for reunification abroad, as it did with respect to Guatemalan UACs" nor made

any other plans to reunify Honduran UACs with their parents in Honduras. *Id.* ¶ 16. And Salazar is not aware of any ORR request for Honduran officials to conduct "home studies," as described in Plaintiffs' declarations. *Id.* ¶ 18.

Considering both parties' submitted evidence, the Court finds that Plaintiffs have shown, by a preponderance of the evidence, that they face a real and immediate threat to future injury sufficient to establish standing at this stage. Defendants admit that DOS officials and the President of Honduras discussed repatriating Honduran UACs and that ORR compiled lists concerning Honduran UACs to provide to DOS, DHS, and the Honduran government in response. And Plaintiffs' evidence shows that Honduran officials have more recently visited UACs' families in Honduras to investigate repatriation options.

Although Defendants deny any repatriation plans, the Court notes three things. First, Salazar states that *ORR* does not have any imminent plans to repatriate eligible Honduran UACs, but she does not claim that DHS and DOS, two agencies in possession of ORR's lists, do not have any such plans. Second, a district court in Arizona, when considering a similar declaration from Salazar, noted that "the lack of an imminent plan means little when Defendants' past actions demonstrate that efforts to transport unaccompanied alien children out of the country may occur in the middle of the night and with only hours or minutes of notice." *Kettlewell v. Noem*, No. CV-25-00491, 2025 WL 2733309, at *8 (D. Ariz. Sept. 25, 2025). And third, Plaintiffs submit a letter, authored by the Government Accountability Project and addressed to Senators John Cornyn and Alex Padilla, that calls into question Salazar's credibility and discusses whistleblowers' belief that Salazar inaccurately represented certain information in the declaration she submitted in *L.G.M.L. v. Noem*, No. 25-cv-2942 (D.D.C). Doc. 29-2.

9

While Plaintiffs do not submit evidence showing that Defendants have deported or attempted to deport Plaintiffs, allegations of future harm can establish Article III standing if that harm is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The Supreme Court's precedent "do[es] not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, [the Supreme Court] ha[s] found standing based on a 'substantial risk' that the harm will occur." *Id.* at 414 n.5. Here, Plaintiffs' evidence shows that Defendants compiled lists of UACs' name and information, including Plaintiffs', worked with the Honduran government to generate repatriation plans, and investigated UACs' repatriation eligibility. These steps indicate that Defendants plan to repatriate Plaintiffs at any moment, potentially without advance notice and in the middle of the night—just as Defendants suddenly started to remove Guatemalan UACs. Plaintiffs' repatriation is not reliant on a "highly attenuated chain of possibilities," but rather Defendants' decision to carry out the plans they have already spent months preparing. *Id.* at 410; *see also L.G.M.L. v. Noem*, 800 F. Supp. 3d 100, 129 (D.D.C. 2025) (stating "the harm from Defendants' 'reunification' plan is obviously imminent for Plaintiffs whom Defendants agree are eligible for it. Defendants plan to return [Plaintiffs] if unrestrained by court order. And they even refuse to disclaim a reunification operation mirroring their first attempt: unannounced, in the middle of the night, and with just a few hours notice to the caretakers and even less to their lawyers"); *cf. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (speculation about "unfettered choices made by independent actors" too attenuated for causation requirement of standing); *Trump v. New York*, 592 U.S. 125, 131 (2020) (holding any future injury too "riddled with contingencies and speculation that impede judicial review" because the Executive had not yet implemented the President's "general statement of policy" and because the

10

dispute involved a process at its preliminary stage); *Dinerstein v. Google, LLC*, 73 F.4th 502, 515–16 (7th Cir. 2023) (rejecting plaintiffs' alleged future injury as a basis for standing because "plaintiffs have offered little more than speculation and assumptions—and importantly, no specific facts" (citation omitted) (internal quotation marks omitted)).

Because the Court finds that Plaintiffs have carried their burden to show their alleged future injury is certainly impending, the Court concludes that Plaintiffs have standing to pursue their claims.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to dismiss for lack of jurisdiction [22].

Dated: May 12, 2026

SARA L. ELLIS
United States District Judge

11